**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **MARCUS G. SMITH,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | No. 5:13-cv-198 (MTT) (CHW) |
| | : | |
| **CAROLYN W. COLVIN,** | : | **Social Security Appeal** |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## REPORT AND RECOMMENDATION

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff Marcus G. Smith's application for benefits. In accordance with the analysis below, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED**.

## BACKGROUND

Plaintiff, who was born in October 1972, applied for Title II benefits on September 28, 2009, alleging an initial onset date of November 21, 2007. (Pl.'s Br., Doc. 10, pp. 3-4). Plaintiff primarily claims to suffer from cognitive problems that limit his ability to follow oral instructions. (R. 33-34). Plaintiff also claims to suffer from depression, which has resulted in weight gain, and from seizures which are possibly associated with hydrocephalus. (R. 31-32). Plaintiff last worked in 2007 for "Country Villa," where he washed dishes and cooked. (R. 25-26). Although Plaintiff's boss at Country Villa, a church friend, tried to help Plaintiff stay on task, Plaintiff claims that he nonetheless struggled with even simple assignments. (R. 34-35, 48-50). When asked at his administrative hearing why he quit the Country Villa job, though,

Plaintiff stated that his "wife was making more than [he] was making, and it just didn't seem to . . . help out with the income of the family." (R. 26).

Plaintiff's application was denied initially and on reconsideration, (R. 66-67), and a reviewing administrative law judge ("ALJ") issued an unfavorable decision on March 14, 2012. (R. 71-89). The ALJ determined that Plaintiff was able to work as a dishwasher, as he had actually performed that job, but that:

> the claimant's family was disappointed he was not able to fulfill their expectations by engaging in the kind of competitive work activity they wanted him to have . . . . By pressing the claimant to attempt work beyond his capabilities rather than allowing him to seek work appropriate to his abilities, it appears his family created a situation in which he simply became work shy.

(R. 87)

Following the ALJ's denial, Plaintiff sought review before the Appeals Council, which denied review on April 5, 2013. (R. 1-3). Plaintiff now seeks review before this Court under "sentence four" of 42 U.S.C. § 405(g). *Ingram v. Comm'r.*, 496 F.3d 1253 (11th Cir. 2007).

## STANDARD OF REVIEW

District courts have a limited role in reviewing claims brought under the Social Security Act. Review of the Commissioner's decision is restricted to a determination of whether the decision is supported by substantial evidence and whether the correct legal standards were applied. *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987). Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Consequently, a court's role in reviewing claims brought under the Social Security Act is quite narrow.

District courts must defer to the Commissioner's factual findings. Courts may not decide facts, re-weigh evidence, nor substitute their judgment for that of the Commissioner. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Credibility determinations are left to the Commissioner and not to the courts. *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991). It is also up to the Commissioner and not to the courts to resolve conflicts in the evidence. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). *See also Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1986). Courts must scrutinize the entire administrative record to determine the reasonableness of the Commissioner's factual findings. *Bloodsworth*, 703 F.2d at 1239. However, even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if it is supported by substantial evidence. *Id.*

The Commissioner's findings of law are given less deference. Courts must determine if the Commissioner applied the proper standards in reaching a decision. *Harrell v. Harris*, 610 F.2d 355, 359 (5th Cir. 1980). Courts must therefore consider any questions of law *de novo*, and "no . . . presumption of validity attaches to the [Commissioner's] conclusions of law, including determinations of the proper standards to be applied in reviewing claims." *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982). The Commissioner's failure to apply the correct legal standards or to provide a sufficient factual basis for the court to determine that the correct legal standards have been followed is grounds for reversal. *Id.*

## EVALUATION OF DISABILITY

Persons are "disabled" for the purposes of receiving benefits under the Social Security Act if they are unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which is expected to result in death or which has

lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A).

When evaluating a claimant's disability, the Commissioner follows a five-step "sequential evaluation procedure." 20 C.F.R. § 404.1520(a)(4)(i)-(v). At step one, the Commissioner determines whether the claimant currently engages in substantial gainful activity. At step two, the Commissioner considers the medical severity of the claimant's impairments. Next, at step three, the Commissioner determines whether the severity of the claimant's impairments (i) meet or equal the severity of one or more of the impairments specified in the listing of impairments; and (ii) meet the duration requirement. If so, the sequential evaluation procedure stops and the claimant is declared "disabled." If not, the Commissioner assesses the claimant's residual functional capacity, ("RFC"), which is defined as "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1). The Commissioner then proceeds to step four where, based on her RFC assessment, she evaluates the claimant's ability to return to past relevant work despite his or her medically-determinable impairments. Finally, at step five, the Commissioner determines whether there are a sufficient number of jobs in the national economy that the claimant can perform in light of his or her RFC, age, education, and work experience.

## DISABILITY EVALUATION IN PLAINTIFF'S CASE

Following the five-step sequential evaluation procedure, the reviewing ALJ made the following determinations in Plaintiff's case. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since at least November 21, 2007, his alleged onset date. (R. 73). At step two, the ALJ found that Plaintiff had the following severe impairments: "a congenital brain anomaly causing hydrocephalus, which necessitated placement of a shunt," "a possible undifferentiated cognitive disorder," "an intermittent seizure disorder," "possible

depression/anxiety," "a personality disorder," and "a history of possible mild dementia." (*Id.*). At step three, the ALJ found that Plaintiff's impairments did not meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 73-74). Therefore, the ALJ assessed Plaintiff's RFC and found that Plaintiff could perform:

> a full range of work at all exertional levels, but with the following non-exertional limitations . . . . [T]he claimant should perform only simple tasks, which must be done in a structured environment where there will be help setting and reaching goals. In addition, the claimant should have no more than occasional contact with the general public, and he should avoid working around industrial hazards.
>
> (R. 75)

Based on this RFC finding, the ALJ found, at step four, that Plaintiff could perform his past relevant work as a dishwasher, as he actually performed that job. (R. 87). The ALJ also made alternative step-five findings, though, and determined that Plaintiff could work as a "Packer/Machine Packager," "Poultry Hanger," and "Machine Presser (Laundry)." (R. 88). Therefore, as a result of both his step-four and step-five findings, the ALJ determined that Plaintiff was "not disabled" within the meaning of the Social Security Act.

## ANALYSIS

Plaintiff argues that (1) the ALJ erred by failing to note that Plaintiff suffers from Dandy-Walker Syndrome; (2) the ALJ erred by discounting the testimony of both Plaintiff and Plaintiff's wife; (3) the ALJ erred by misrepresenting the opinion of Dr. A. Melton Strozier, Jr., a non-treating examining psychologist; and (4) that the ALJ was personally biased. (Pl.'s Br., Doc. 10, pp. 11-15, Reply, Doc. 13, pp. 1-5). As discussed below, the record does not support Plaintiff's arguments. Rather, because Commissioner's decision is based on proper legal standards and is supported by substantial evidence, it is recommended that the Court affirm.

(1) <u>Dandy-Walker Syndrome</u>

Plaintiff first argues that the ALJ erred by failing to accept diagnoses of Dandy-Walker Syndrome, a congenital brain condition from which Plaintiff suffers. (Pl.'s Br., Doc. 10, p. 12). The relevant portion of Plaintiff's brief reads:

> The ALJ's analysis of [Plaintiff's] condition is very curious. In his decision, the ALJ states that "the evidence is not entirely clear what label is most appropriate for them" (Tr. 86). As noted above, however, [Plaintiff's] neurologists have determined that he suffers from Dandy-Walker Syndrome which is a congenital condition that can produce hydrocephalus, seizures, and cognitive limitations such as [Plaintiff] has experienced (*See*, Tr. 524). In fact, [Plaintiff's] family had thought his seizures were due to trauma.

(Pl.'s Br., Doc. 10, p. 12)

Contrary to Plaintiff's argument, the ALJ clearly acknowledged and accepted the diagnoses of Dandy-Walker Syndrome in the record.[1] At step two, the ALJ found that Plaintiff suffered from "a congenital brain anomaly causing hydrocephalus." (R. 73). Additionally, when assessing Plaintiff's RFC, the ALJ noted that Plaintiff "developed hydrocephalus when he was 17-years old, which was said to be caused by a congenital defect," (R. 76), and that "[t]esting conducted in November 2004 suggested [that Plaintiff] had a congenital anomaly of the brain affecting the interconnection between his left and right hemispheres." (R. 78). Elsewhere in his opinion, the ALJ noted that "[t]esting conducted in October 2006 confirmed . . . that [Plaintiff's] congenital brain anomaly had not changed." (R. 80). Finally, the ALJ acknowledged but discounted a finding by Plaintiff's neurologist that Plaintiff was disabled "on the basis of [a] congenital cerebral malformation." (R. 83, 87).

---

[1] Insofar as Plaintiff argues that the ALJ simply failed to use the term "Dandy-Walker Syndrome," this argument does not provide grounds for reversal.

Nothing in the portion of the ALJ's opinion cited by Plaintiff indicates that the ALJ rejected or discounted the relevant diagnoses of Dandy-Walker Syndrome. (R. 86). Rather, both the record and indeed Plaintiff's own brief support the ALJ's determination that "the evidence is not entirely clear what label is most appropriate for Plaintiff's [mental impairments]." (*Id.*). At various times, in addition to Dandy-Walker Syndrome, Plaintiff was diagnosed with: seizure disorder, anxiety, depression, dementia, fatigue, a personality disorder, and epilepsy. (R. 287-99, 311-13, 343, 356, 371, 375, 391, 395, 400, 429, 459, 464, 528). Additionally, Plaintiff's mother indicated that Plaintiff's concentration problems and perhaps his seizures were the result of head trauma, as opposed to Plaintiff's congenital brain condition. (R. 368-69). Faced with this array of conflicting evidence and inconsistent diagnoses, and in the face of potentially overlapping mental impairments, many of which apparently result in the same type of symptoms and functional limitations, the ALJ properly determined that, "without regard to their nomenclature," Plaintiff suffers from "severe" mental impairments, Dandy-Walker Syndrome among them. (R. 86).

(2) The Credibility of Plaintiff and his Wife

Plaintiff second argues that the ALJ erred in discounting the testimony of both Plaintiff and Plaintiff's wife without indicating why their testimony was not accurate. (Pl.'s Br., Doc. 10, p. 13). Contrary this argument, the ALJ included in his opinion a six-point list expressly stating the reasons he found the testimony of both Plaintiff and Plaintiff's wife to be less than credible. The ALJ's reasons, restated in brief, are as follows:

1. The longitudinal evidence suggested that Plaintiff's mental state was "essentially normal;"

2. Even the most sympathetic psychological evaluator in the record, Dr. Strozier, indicated that Plaintiff had a normal memory and that Plaintiff could "focus whenever he chose to;"

3. Plaintiff did not adequately participate in psychiatric treatment;

4. Plaintiff generally required only routine, outpatient care, and his shunt surgeries were successfully performed;

5. Plaintiff took only a modest amount of medication, and the record did not adequately support Plaintiff's claims of side effects; and

6. Plaintiff's activities of daily living did not support a finding of "disabled."

(R. 86)

Plaintiff addressed the ALJ's sixth point, "activities of daily living," only in his reply brief, (Doc. 13, pp. 5-7), and even then, Plaintiff merely argued that the Commissioner, in her brief, did not present a "complete picture" of an Adult Function Report completed by Plaintiff's wife. (R. 204-11). Of course, the ALJ discounted that Adult Function Report, in part, because it included the very statements that Plaintiff now cites in his brief—statements indicating that Plaintiff:

- can no longer follow directions, work independently, or think critically;

- can prepare complete meals, but only very slowly and with specific instructions and cues;

- has a poor ability to plan, organize and manage time, and is frequently inattentive; and

- cannot complete tasks independently, and is unable to concentrate.

(R. 204-09)

This Court is tasked with reviewing the record to determine whether substantial evidence supports the Commissioner's *decision*, not whether the administrative record supports the Commissioner's *brief*. Because the probative value of the above listed quotes is precisely the issue in contention, and because Plaintiff largely failed to address that issue in his briefs, Plaintiff's argument is largely immaterial.

Regarding Plaintiff's daily activities—the only credibility factor which Plaintiff has placed at issue—substantial evidence supports the ALJ's determination that Plaintiff's daily activities are not consistent with a finding of disability. In addition to caring for himself, Plaintiff, with reminders and instructions, is able to: prepare and drive his twin daughters to school; help to homeschool his son; care for the family's two dogs; and perform household chores such as cooking, cleaning and mowing the lawn. (R. 29-31, 36-39, 45-48, 204-06). These activities, along with the five other factors cited by the ALJ—factors which Plaintiff did not address—constitute substantial evidence supporting the ALJ's credibility determination.

(3) Dr. Strozier's Findings

Plaintiff argues that the ALJ misstated the findings of Dr. A. Melton Strozier, Jr., a non-treating examining psychologist who completed a psychological evaluation in May 2005. (R. 368-75) (Pl.'s Br., Doc. 10, pp. 13-14; Reply, Doc. 13, pp. 2-4). Much of Plaintiff's argument, however, merely summarizes Dr. Strozier's findings and conclusions, and thus appears to ask the Court to reweigh the evidence—something the Court cannot do.[2] *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) ("We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner]").

---

[2] *See, e.g.*, Reply, Doc. 13, p. 3 ("[T]he ALJ claimed that Dr. Strozier's findings did not support a conclusion that the claimant was completely unable to engage in work activity . . . . A review of Dr. Strozier's report reveals a different conclusion") (quotations omitted).

Contrary to Plaintiff's argument, the ALJ accurately recounted and properly assessed Dr. Strozier's findings and conclusions on pages eight and nine of his opinion. (R. 78-79). For example, under the "Summary and Conclusions" portion of his March 2005 psychological evaluation, Dr. Strozier concluded, in part:

> The overall profile for [Plaintiff] is a fairly complex one. When we look at his neurological functioning we find an individual who *seems to be functioning within normal limits. His IQ and his memory functions are normal.* He has some difficulty with visual motor integration. *He seems to be capable of focusing when he chooses to* although his ability to focus and concentrate is notably lacking according to the persons in his life. In terms of personality profile this appears to be an individual who suffers from a significant level of depression and anxiety. He seems to have a rather apathetic approach to life.

(R. 374) (emphasis added)

In recounting Dr. Strozier's conclusions and in assigning them "some weight [as] consistent with the longitudinal evidence," (R. 79), the ALJ stated:

> [Dr. Strozier] conducted a battery of tests that indicated [Plaintiff] had average intelligence and normal memory. Moreover, [Plaintiff] seemed capable of focusing whenever he chose to. However, other testing suggested he was suffering from anxiety, depression and apathy.

(R. 78)

Dr. Strozier also found that it was "most likely by virtue of [his] history and the nature of his injuries that [Plaintiff] could qualify for disability and spend the rest of his life as a contented husband, father, and member of the community."[3] (R. 375). *Cf.* 20 C.F.R. § 404.1527(d)(1) (noting that decisions about whether or not claimants meet the statutory definition of disability

---

[3] As both the Commissioner and the ALJ noted, Dr. Strozier elsewhere indicated that he would not "feel comfortable about getting [Plaintiff] into the disability system until . . . [trying] psychiatric intervention." (R. 377).

are reserved to the Commissioner). The ALJ assigned "little weight" to Dr. Strozier's finding that Plaintiff's was "likely disabled."

In neither case did the ALJ misstate Dr. Strozier's findings. Rather, the ALJ recounted, almost verbatim, Dr. Strozier's own conclusions. That the ALJ did not recite every diagnosis and detail the results of each of Dr. Strozier's "battery of tests" is not grounds for reversal. Rather, because the ALJ adequately evaluated Dr. Strozier's findings, and because the ALJ's determination regarding Dr. Strozier's findings is supported by substantial evidence, there is no basis to disturb the decision below.

(4) Personal Bias

Fourth and finally, Plaintiff argues, without extensive elaboration, that the ALJ "injected improper and inaccurate personal bias into the evaluation of [Plaintiff's] claim that irreparably tainted [the ALJ's] analysis." (Reply, Doc. 13, p. 1). Plaintiff specifically appears to take issue with the following portion of the ALJ's opinion:

> In the end, the longitudinal evidence confirms exactly what the claimant said at the hearing, specifically, he and his family simply made the utilitarian decision that his role was to be that of a househusband for his young and growing family. Certainly, no one can fault the claimant or his family in this regard. In fact, the claimant's decision to stay home to take care of his family may be commendable. However, this was a personal choice, which was not necessarily suggestive of "disability."
>
> In addition, it appears the claimant's family was disappointed he was not able to fulfill their expectations by engaging in the kind of competitive work activity they wanted him to have. However, there is dignity in all work activity, no matter how simple it may be. By pressing the claimant to attempt work beyond his capabilities rather than allowing him to seek work appropriate to his abilities, it appears his family created a situation in which he simply became work shy.

(R. 86-87)

While it is true that a "[t]rial before an unbiased judge is essential to due process," *Miles v. Chater*, 84 F.3d 1397, 1401 (11th Cir. 1996), nothing about the cited passage indicates bias. Plaintiff himself, at his administrative hearing, indicated that he quit his last job at Country Villa in 2007 because "my wife was making more than I was making, and it just didn't seem to . . . help out with the income of the family." (R. 26). The record also indicates that Plaintiff enjoys cooking and has a diploma in culinary arts, (R. 25-26, 49), and it is likely for these reasons that Plaintiff took on tasks such as cooking and "prep work" in addition to washing dishes. At most, the term "work shy" was an unnecessary and perhaps unfair characterization of Plaintiff on the part of the ALJ. This single term, though, does not change the fact that the ALJ based his opinion on the evidence of record, and that he did so without any apparent personal bias toward Plaintiff.

## CONCLUSION

After careful consideration of the record, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED**. Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this **RECOMMENDATION** with the District Judge to whom this case is assigned **WITHIN FOURTEEN (14) DAYS** after being served with a copy thereof.

**SO RECOMMENDED**, this 10th day of July, 2014.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge